**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SENTRY SELECT INSURANCE
COMPANY; LLOYDS SYNDICATES 588,
861 AND 1209; KELLY-RYAN INC.,
        *Plaintiffs-Appellants,*

v.

ROYAL INSURANCE COMPANY OF
AMERICA; ALASKA NATIONAL
INSURANCE COMPANY,
        *Defendants-Appellees.*

No. 05-35323

D.C. No.
CV-01-01956-RSM

SENTRY SELECT INSURANCE
COMPANY; LLOYDS SYNDICATES 588,
861 AND 1209; KELLY-RYAN INC.,
        *Plaintiffs-Appellees,*

v.

ROYAL INSURANCE COMPANY OF
AMERICA,
        *Defendant-Appellant,*

and

ALASKA NATIONAL INSURANCE
COMPANY,
        *Defendant.*

No. 05-35354

D.C. No.
CV-01-01956-RSM

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted
October 17, 2006—Seattle, Washington

3893

Filed April 6, 2007

Before: Dorothy W. Nelson, David R. Thompson, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Thompson

## COUNSEL

Donald K. McLean, Seattle, Washington, for the plaintiffs-appellants/appellees.

Michael D. Helgren, Seattle, Washington, for the defendants-appellees/appellants.

## OPINION

THOMPSON, Senior Circuit Judge:

Appellants and cross-appellees Kelly-Ryan, Inc., Sentry Select Insurance Company, and Lloyd's Syndicates 588, 861, and 1209 (collectively, "Kelly-Ryan and the P&I Underwriters") appeal the district court's summary judgment in favor of appellee and cross-appellant Royal Insurance Company ("Royal"). The district court held that Kelly-Ryan is not entitled to indemnity from Royal under the Marine Coverage Endorsement ("MEL") to the Big Shield Commercial Catastrophe Liability Insurance Policy ("Big Shield policy") issued by Royal, because Kelly-Ryan breached its duty of *uberrimae fidei* (utmost good faith) to Royal under federal maritime law.

Kelly-Ryan sought indemnification from Royal after settling a Jones Act suit, 46 U.S.C. § 30104(a) (formerly codified as 46 U.S.C. § 688(a)), with one of its maritime employees who was electrocuted during the delivery of a prefabricated house in remote Alaska. The district court held that, under federal maritime law, the doctrine of *uberrimae fidei* required Kelly-Ryan to disclose to Royal the material fact that employees covered under the MEL endorsement routinely worked with electrical power lines. Kelly-Ryan had not made that disclosure.

Kelly-Ryan and the P&I Underwriters contend that the Royal Big Shield policy and the MEL endorsement do not

constitute marine insurance over which we may exercise admiralty jurisdiction, and as a result the *uberrimae fidei* doctrine does not apply to bar indemnification from Royal. We agree, but affirm the district court's summary judgment in favor of Royal on the ground that Royal is not obligated to provide indemnity for the injured seaman's injuries because those injuries did not occur in an accident covered by the MEL endorsement.

We do not reach the question whether the injured seaman's injuries were covered under the Alaska State Workers' Compensation Act; whether covered or not under that Act, Royal is not obligated to provide indemnity for them under the facts of this case.

We have jurisdiction under 28 U.S.C. § 1291 and we affirm the district court's summary judgment in favor of Royal.

## I.   BACKGROUND

This litigation arises out of an accident which occurred on land in Napakiak, Alaska during the movement of a modular prefabricated house from a barge to a remote construction site. Kelly-Ryan, a construction company based in Seattle, Washington, shipped prefabricated houses from Washington and installed them in various Native Alaskan villages under a contract with the federal government. When the barge carrying the houses reached Alaska, the houses were unloaded from the barge onto "house movers," which were large treaded vehicles used to carry the houses to the construction sites.

On September 27, 2000, James Okada, a maritime employee of Kelly-Ryan working on the tugboat Casey Marie, was electrocuted while he was helping a Kelly-Ryan shore-based crew deliver a prefabricated house to a building site located approximately one and a half miles from the shore. The shore-based crew enlisted Okada to stand on top

of the house and lift up what were supposed to be de-powered electrical power lines so that the house and the house mover could pass underneath. Unfortunately, the high voltage electrical power line running into Napakiak from another village had not been de-powered, and Okada was electrocuted, suffering severe injuries.

Although Okada normally worked as a "seaman," on the day of the accident a Kelly-Ryan shore-based crew "borrowed" Okada to help them deliver the houses. For his work with the shore-based crew, Kelly-Ryan paid Okada "cargo time" or "lashing pay" in addition to his daily rate as a seaman. Okada sued Kelly-Ryan for negligence under the Jones Act, 46 U.S.C. § 30104(a) (formerly codified as 46 U.S.C. § 688(a)), and eventually obtained a settlement in excess of $5.2 million.

When the accident occurred, Kelly-Ryan had several insurance policies in place covering multiple aspects of its operations. Sentry Select and Lloyd's insure Kelly-Ryan's vessel operations and crewmembers under a Marine Protection and Indemnity policy ("P&I policy"). Alaska National insures Kelly-Ryan for various shore-based risks, including employee-related injuries. Part One of the Alaska National policy covers Washington and Alaska State workers' compensation, unemployment, and disability claims, as well as claims under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901, *et seq.* Part Two of the Alaska National policy, the employers' liability portion, provides coverage for bodily injuries arising out of and in the course of employment, but excludes "any obligation imposed by a workers compensation . . . law."

Royal is the excess/umbrella insurer for Kelly-Ryan; its Big Shield policy provides excess coverage over Part Two of the Alaska National policy, Kelly-Ryan's automobile insurance, and Kelly-Ryan's Commercial General Liability ("CGL") policy with Alaska National. The Big Shield policy does not

provide excess coverage over claims under Part One of the Alaska National policy or the P&I policies, and contains a workers' compensation exclusion excepting from coverage "[a]ny obligation of the insured under a workers compensation . . . law." At the time of the accident, Kelly-Ryan paid a flat yearly premium of $17,000 for the Royal Big Shield policy.

In 1995, Kelly-Ryan obtained from Royal an MEL endorsement to Part Two of the Alaska National policy (employers' liability) and the Royal Big Shield policy. The MEL endorsement extended coverage for bodily injuries suffered by a "master or member of the crew of any vessel" performing work "necessary or incidental" to the following tasks: "Painting and/or scraping of decks of tugs or barges, and loading and unloading as applicable in Washington and Alaska." The coverage limit on the MEL endorsement to the employers' liability insurance with Alaska National is $1 million; any liability in excess of $1 million, so far as applicable in this case, is covered by the Royal Big Shield policy.

After the accident, Kelly-Ryan, on behalf of Okada, filed a claim for Alaska workers' compensation benefits under Part One of the Alaska National policy. Although Alaska National initially processed the claim and paid benefits, it notified Kelly-Ryan on November 9, 2000 that it was controverting the claim because Okada was a "Jones Act crewman" whose claim was covered under the P&I policy. Kelly-Ryan contested Alaska National's denial of coverage under Part One of the policy. However, rather than challenge the loss of workers' compensation benefits, Okada in July 2001 filed suit in the Western District of Washington against Kelly-Ryan for damages under the Jones Act, 46 U.S.C. § 30104(a), and general maritime law.

In May 2001, the P&I Underwriters entered an agreement with Kelly-Ryan to defend and indemnify Kelly-Ryan for Okada's claim in the event Alaska National denied coverage.

The P&I Underwriters also agreed to waive two coverage limitations that could have operated to exclude Okada's claim. In return, Kelly-Ryan assigned to the P&I Underwriters any and all causes of action it had against Alaska National.

On December 3, 2001, Kelly-Ryan and the P&I Underwriters filed the instant suit against Alaska National, requesting a declaratory judgment on coverage and allocation of liability. Kelly-Ryan and the P&I Underwriters later stipulated to Okada's "seaman" status[1] at the time of his injury. On April 18, 2002, Kelly-Ryan and the P&I Underwriters moved for summary judgment, asking the court to determine that coverage for Okada's injuries fell under Part Two of the Alaska National policy, the employers' liability provision, rather than under the P&I policies. The district court issued an order on July 11, 2002 directing Alaska National to defend the claim because Kelly-Ryan was "entitled to look to [Alaska National's] MEL policy for defense and indemnification." The court also awarded Sentry Select attorney fees "based on the Court's determination that coverage for Okada's claims are

[1]Okada's status as a "seaman" working aboard the Casey Marie at the time the accident occurred is important because the Jones Act provides a cause of action in negligence for "any seaman" injured "in the course of his employment." 46 U.S.C. § 30104(a) (formerly codified as 46 U.S.C. § 688(a)). "Under general maritime law prevailing prior to the statute's enactment, seamen were entitled to 'maintenance and cure' from their employer for injuries incurred 'in the service of the ship' and to recover damages from the vessel's owner for 'injuries received by seamen in consequence of the unseaworthiness of the ship,' but they were 'not allowed to recover an indemnity for the negligence of the master, or any member of the crew.' " *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995) (quoting *The Osceola*, 189 U.S. 158, 175 (1903)). However, with the passage of the Jones Act, a seaman could elect to bring a suit seeking civil damages and a jury trial under federal maritime law, even if the situs of the tort was on land. This is because jurisdiction under the Jones Act "depends 'not on the place where the injury is inflicted . . . but on the nature of the seaman's service, his status as a member of the vessel, and his relationship as such to the vessel and its operation in navigable waters.' " *Chandris*, 515 U.S. at 359-60 (alteration in original) (quoting *Swanson v. Marra Bros., Inc.*, 328 U.S. 1, 4 (1946)).

properly under the Alaska National policy." The district court further clarified that although liability had not yet been found, liability would implicate Kelly-Ryan as the employer of Okada, and therefore the P&I policy would not cover Okada's claims because that policy covered Kelly-Ryan only "as owner" of the vessel Casey Marie.

Alaska National then moved for reconsideration, arguing that the district court's order failed to separate the duty to defend from the duty to indemnify. The district court denied the motion for reconsideration, but clarified that the previous order held only that Alaska National had a duty to defend. The district court further held it would not look to extrinsic evidence of the parties' intent to determine if the Alaska National policy covered Okada's claim. Alaska National sought interlocutory review from our court and on October 14, 2003, we affirmed the district court's decision. *Sentry Select Ins. Co. v. Alaska Nat. Ins. Co.*, 72 Fed. Appx. 602, 2004 A.M.C. 1801 (9th Cir. 2003).

In the meantime, on August 23, 2002, Okada settled his claims against Kelly-Ryan for $5,276,630.47. Following the settlement, on December 5, 2002, Kelly-Ryan and the P&I Underwriters moved to amend their complaint to add Royal as a defendant. They then immediately moved for summary judgment, asking the court to determine that Alaska National and Royal were in breach of their policies to the extent that those insurers "are obligated to defend and/or indemnify plaintiffs pursuant to their policy of marine insurance" and sought "a declaration of their rights with respect to the policies of marine insurance identified above." On January 24, 2003, the district court issued a stay pending a ruling on the interlocutory appeal.

The district court lifted the stay on October 27, 2003, and the plaintiffs again moved for summary judgment, asking the court to determine the individual insurers' respective obligations for reimbursement for the Okada settlement. The district

court denied the motion on March 4, 2004, and granted the parties additional time for discovery.

Alaska National filed a motion for partial summary judgment on September 28, 2004, seeking a declaration that Part One of the Alaska National policy, the workers' compensation provision, did not cover Okada's claims. Royal opposed Alaska National's motion for summary judgment, arguing that Okada's claims were properly covered under the Alaska National workers' compensation provision and that the workers' compensation exclusion in its Big Shield policy precluded liability by Royal for "[a]ny obligation of the insured under a workers' compensation . . . or any similar laws." Royal filed a motion for summary judgment on October 26, 2004, asserting that: (1) Okada's claims did not fall within the MEL endorsement of Part Two of the Alaska National policy; (2) the May 2001 agreement between Kelly-Ryan and the P&I Underwriters created other excess coverage and the P&I Underwriters waived their rights to collect from Royal; and (3) the MEL endorsement was void *ab initio* because Kelly-Ryan violated the federal maritime doctrine of *uberrimae fidei*, the duty of utmost good faith, because it failed to disclose to Royal several material facts prior to the issuance of the MEL. Kelly-Ryan and the P&I Underwriters also filed a motion for summary judgment on October 27, 2004, but the district court struck the motion as untimely.

On January 13, 2005, the district court granted Alaska National's motion for partial summary judgment, ruling that the Okada settlement was not covered by Alaska workers' compensation laws because the Okada settlement settled a Jones Act negligence claim and not a workers' compensation claim. The district court stated that "it is well settled that '[w]here an action settles prior to trial . . . the duty to indemnify must be determined on the basis of the settlement, *i.e.*, the undisputed facts set forth in the underlying complaint and those known to the parties.' " (alterations in original) (quoting *Enron Oil Trading & Transp. Co. v. Underwriters of Lloyd's*

*of London*, 47 F. Supp. 2d 1152, 1161 (D. Mont. 1996), *aff'd in part, rev'd in part sub nom. Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*, 132 F.3d 526 (9th Cir. 1997)).

The district court acknowledged that Royal had alleged there had been collusion between Sentry Select, Lloyd's, and Alaska National which led to the joint stipulation in the first lawsuit that Okada was a seaman, but found that this was "beside the point at this stage in the litigation." The district court further noted that "[t]hose arguments go to the reasonableness of the settlement, which cannot be relitigated" and stated that the proper time for Royal to have raised the issue of the workers' compensation exclusion in its Big Shield policy would have been at the time of the settlement, when it should have sought to apportion the settlement funds. The court found that the "parties settled a Jones Act negligence claim, not a workers' compensation claim, and therefore, the Workers Compensation portion of the Alaska National policy is not implicated in the allocation of the underlying settlement fund." Finally, the court found that the settlement was not intended to include any potential workers' compensation monies and that the clause in the settlement releasing any such claims did not indicate an actual settlement of such a claim.

The district court issued a separate order on January 13, 2005, granting in part and denying in part Royal's motion for summary judgment. The court denied Royal's motion insofar as it rejected Royal's contention that Okada's injuries fell outside the scope of the MEL endorsement. The district court first found that the terms "loading and unloading" in the MEL endorsement are ambiguous, and that Washington law required it to "give effect to the reasonable interpretation most favorable to the insured." Because the terms "loading and unloading" appeared in a clause relating to coverage rather than exclusion of coverage, the court found that a broad interpretation was appropriate. The court then adopted a definition of the terms under the "complete operation theory," which defines "loading and unloading" as "the entire process

involved in the movement of the article, thereby omitting any distinction between 'loading' and preparatory activities or 'unloading' and 'delivery.' " (citing *Transamerica Ins. Group v. United Pac. Ins. Co.*, 92 Wn. 2d 21, 25, 593 P.2d 156 (1979), *overruled on other grounds by State v. Olson*, 126 Wn. 2d 315, 893 P.2d 629 (1995)).

The court next determined that Okada's employment was "incidental" to "loading and unloading," referencing the definition in the Merriam-Webster online dictionary which defined incidental as "being likely to ensue as a chance or minor consequence." The court then stated: "There is no question that part of Mr. Okada's employment duties was to assist the shore-based crew move [sic] houses from the tug boat to the construction site. The Court has already determined that he was in the process of 'unloading' the house at the time he was injured." Therefore, the court reasoned, Okada's claims fell within the MEL endorsement.

The district court granted Royal's motion for summary judgment on *uberrimae fidei* because it found that Kelly-Ryan failed to disclose material facts about what type of work its vessel employees performed. The district court found "disingenuous" Kelly-Ryan and the P&I Underwriters' contention that the federal maritime law of *uberrimae fidei* was inapplicable because Kelly-Ryan brought the suit in admiralty and initially argued that the Big Shield policy was marine insurance.

The district court then rejected Kelly-Ryan and the P&I Underwriters' argument that, even if federal maritime law applied, Kelly-Ryan did not have a duty to disclose that its employees would be handling high-voltage power lines because it knew only that they would be working with low-voltage lines. The district court found that this excuse "mischaracterizes the real issue," reasoning that "any reasonable person knows that when handling power lines, whether low voltage or high voltage, there is a risk of handling a wire that

has not been de-powered and injury could occur." Accordingly, the court determined that Kelly-Ryan had violated the duty of utmost good faith and that "Royal may void its excess liability policy as to Mr. Okada's injuries pursuant to the *uberrimae fidei* doctrine." Finally, because the district court granted summary judgment in favor of Royal on the issue of *uberrimae fidei*, it did not address Royal's second contention that the P&I Underwriters waived Royal's obligation to provide coverage in excess of the MEL portion when they agreed to defend and indemnify Kelly-Ryan.

Kelly-Ryan and the P&I Underwriters timely appeal to this court the district court's summary judgment in favor of Royal on *uberrimae fidei*. Royal timely cross-appeals the district court's summary judgment in favor of Alaska National on the question of workers' compensation coverage, and in favor of Kelly-Ryan and the P&I Underwriters on coverage for Okada's injuries under the MEL endorsement.

## II.   STANDARD OF REVIEW

We review de novo whether the district court had subject matter jurisdiction, and we must accept the district court's factual findings on jurisdiction unless they are clearly erroneous. *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 554 (9th Cir. 1992).

"A grant of summary judgment is reviewed de novo. Our review is governed by the same standard used by the district court under Fed. R. Civ. P. 56(c)." *Certain Underwriters at Lloyd's v. Montford*, 52 F.3d 219, 221-22 (9th Cir. 1995) (citation omitted). Under Federal Rule of Civil Procedure 56(c), "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

We review de novo the district court's analysis of contractual language and its application of principles of contract interpretation. *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 367 (9th Cir. 1985).

## III.   DISCUSSION

### A.   *Jurisdiction*

### 1.   *Admiralty Jurisdiction*

Royal argues that Kelly-Ryan either waived or is estopped from raising the argument that the Big Shield policy is not marine insurance because it brought this action in admiralty, initially claiming that the policy is a marine insurance contract over which we have admiralty jurisdiction. Royal also points out that Kelly-Ryan and the P&I Underwriters cannot have it "both ways"— they cannot simultaneously argue that the Big Shield policy is not maritime insurance and that it covers Okada's Jones Act claim.

**[1]** We disagree. Although Kelly-Ryan and the P&I Underwriters did not challenge admiralty jurisdiction until later in the course of the litigation, their failure to challenge the district court's subject matter jurisdiction earlier did not waive such a challenge. *See Attorneys Trust v. Videotape Computer Prods., Inc.*, 93 F.3d 593, 594-95 (9th Cir. 1996). A "disappointed plaintiff" may attack subject matter jurisdiction for the first time on appeal, *id.* at 595, and may raise a jurisdictional issue even though it is not of "constitutional magnitude." *Clinton v. City of New York*, 524 U.S. 417, 428 (1998). It is inconsequential to our jurisdictional analysis whether Kelly-Ryan at one point claimed that the policy was a marine insurance policy, because even a joint stipulation cannot cure a jurisdictional defect. *See Rains v. Criterion Sys., Inc.*, 80 F.3d 339, 342 (9th Cir. 1996); *see also Galt G/S v. Hapag-Lloyd AG*, 60 F.3d 1370, 1373 (9th Cir. 1995) ("[W]e inquire *sua sponte* whether admiralty or diversity jurisdiction pro-

vided the district court with an independent basis for federal subject matter jurisdiction . . . .").

**[2]** We thus turn to the question whether admiralty jurisdiction exists over Kelly-Ryan's claim against Royal. Admiralty jurisdiction hinges on whether the Big Shield insurance policy with the MEL endorsement is a maritime insurance contract. *See Insurance Co. v. Dunham*, 78 U.S. (11 Wall.) 1, 35-36 (1870) (holding that admiralty jurisdiction extends to maritime insurance contracts). If the Big Shield policy is maritime, "and the dispute is not inherently local, federal law controls the contract interpretation." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004) (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961)).

Unfortunately, it is often difficult to determine whether a contract is maritime because there are few "clean lines between maritime and non-maritime contracts," *Norfolk S. Ry. Co.*, 543 U.S. at 23, and the separation between the two is "conceptual rather than spatial," *Kossick*, 365 U.S. at 735. The conceptual boundary is defined by the purpose of the jurisdictional grant — "the protection of maritime commerce." *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 608 (1991) (internal quotation marks omitted).

**[3]** To ascertain whether an insurance policy is maritime, we must examine the "nature and subject-matter" of the contract, *Exxon Corp.*, 500 U.S. at 611, and "the true criterion is whether it has reference to maritime service or maritime transactions," *Norfolk S. Ry. Co.*, 543 U.S. at 23-24 (internal quotation marks omitted). Under the old and now outdated rule, admiralty jurisdiction was said to be reserved to "contracts, claims, and services *purely* maritime," *Rea v. The Eclipse*, 135 U.S. 599, 608 (1890) (emphasis added). We have recognized two exceptions to this "purely maritime" rule.

> First, admiralty may take jurisdiction of an entire contract if the nonmaritime obligations are merely

incidental to the primary maritime nature of the contract. Second, if the nonmaritime obligations are substantial, admiralty may take jurisdiction over any maritime obligations that can be severed from the nonmaritime obligations and separately adjudicated without prejudice to the parties.

*Simon v. Intercontinental Transp. (ICT) B.V.*, 882 F.2d 1435, 1442 (9th Cir. 1989) (citations omitted); *see also La Reunion Francaise SA v. Barnes*, 247 F.3d 1022, 1025 (9th Cir. 2001).

The Supreme Court's later decision in *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, undercuts the continuing force of these two exceptions by our court. *See Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc) (holding that a three-judge panel may depart from circuit precedent that has not been "expressly overruled" when an intervening en banc or Supreme Court decision has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable").

**[4]** The dispute in *Norfolk* centered on whether a "through" bill of lading, a single bill of lading under which "cargo owners can contract for transportation across oceans and to inland destinations in a single transaction," was a maritime contract despite providing for significant land transit by rail. *Norfolk S. Ry. Co.*, 543 U.S. at 26. The sea leg of the journey was successful, but the train carrying the cargo inland derailed en route, causing approximately $ 1.5 million in damage to the cargo. *Id.* at 21. The Supreme Court held that although the accident occurred during the land portion of the journey, the entire bill of lading was nonetheless a maritime contract over which admiralty jurisdiction extended. The Court explained that courts cannot simply ask "whether a ship or other vessel was involved in the dispute," or focus solely on "the place of the contract's formation or performance." *Id.* at 23-24. Rather, the dispositive inquiry must be "whether the principal objective of [the] contract is maritime commerce." *Id.* at 25.

In articulating the "primary objective test," the *Norfolk* Court explicitly rejected the spatial approach adopted by some lower federal courts, which had determined whether a contract was maritime by assessing whether its land components were "incidental" to its maritime components. *Id.* at 26. The Court reasoned that "it seems to us imprecise to describe the land carriage required by an intermodal transportation contract as 'incidental'; realistically, each leg of the journey is essential to accomplishing the contract's purpose." *Id.* at 26-27. The Court then found the "incidental" test inconsistent with the conceptual approach and overruled it "to the extent . . . that [it] depends solely on geography." *Id.* at 27. In finding that the "through" bill of lading was a maritime contract governed by federal law, the Court explained that its "primary objective [was] to accomplish the transportation of goods by sea from Australia to the eastern coast of the United States." *Id.* at 24. The Court emphasized that the bill of lading's "character as a maritime contract is not defeated simply because it also provides for some land carriage" and that "[c]onceptually, so long as a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce—and thus it is a maritime contract." *Id.* at 27.

Here, Royal argues that the Big Shield policy is a maritime insurance contract because the maritime obligations contained in the MEL endorsement can be severed from the Big Shield policy. However, we find that our "severability" exception collapses in the wake of the *Norfolk* Court's conceptually-based "primary objective" test. First, severing the maritime components from the non-maritime components is inconsistent with the Court's directive that we look to whether the "principal objective of a contract is maritime commerce." *Id.* at 25. Second, although the Court in *Norfolk* rejected a purely spatial approach, the Court stated that "[g]eography [ ] is useful . . . only in a limited sense: [i]f a bill's *sea* components are insubstantial, then the bill is not a maritime contract." *Id.* at 27 (emphasis in original). The severability exception incorrectly focuses on the severability of the sea components, not

on whether they are insubstantial in comparison to the land components. Third, if the Court had wished to recognize a severability exception, then there could not have been a better context in which to fashion this exception than the intermodal shipment context — the Court could have treated the ocean shipping leg as maritime and severed the non-maritime land leg of the bill of lading. Yet instead, the Court employed a "primary objective" test which examined the contract as a whole to determine whether its primary purpose was to protect or affect maritime commerce.

In rejecting the lower courts' piecemeal approach, the *Norfolk* Court undermined the viability of our "severability" exception. *Id.* at 27; *see also Folksamerica Reinsurance Co. v. Clean Water of New York*, 413 F.3d 307, 315 (2d Cir. 2005) (re-working the Second Circuit's "incidental exception" such that it focuses "on whether the principal objective of a contract is maritime commerce, rather than on whether the non-maritime components are properly characterized as more than 'incidental' or 'merely incidental' to the contract," and holding that "admiralty jurisdiction will exist over an insurance contract where the primary or principal objective of the contract is the establishment of policies of marine insurance" (internal quotation marks and citations omitted)). Therefore, we decline to apply the "severability" exception and focus instead on whether the "primary objective" of the Big Shield policy was to provide insurance coverage for maritime commerce. *See Miller*, 335 F.3d at 899-900.

**[5]** When considered as a whole, the Big Shield policy, even as amended by the MEL endorsement, fails the *Norfolk* Court's "primary objective" test because the principal purpose of the policy is to provide umbrella coverage in excess of Kelly-Ryan's "shore-side" insurance policies, not to protect Kelly-Ryan's maritime commerce operations.

Consistent with most shore-side commercial general liability ("CGL") insurance contracts, the Big Shield policy

excludes traditional marine risks such as pollution and contains a Watercraft Limitation. The Watercraft Limitation limits liability for any bodily injury or property damage arising out of "ownership, maintenance, operation, use, loading or unloading of any watercraft" to that covered by the underlying insurance; the underlying Alaska National policy excludes "bodily injury' or 'property damage' arising out of the ownership, maintenance, use [including loading or unloading] or entrustment to others of any aircraft, auto or watercraft owned or operated by or rented or loaned to any insured." *See* 9 *Couch on Insurance* § 127:37 (3d ed. 2006) (stating that typical CGL policies "exclude coverage for damages arising out of the ownership, maintenance, use, loading, or unloading of a watercraft").

The only portion of the Big Shield policy relating to maritime commerce is the MEL endorsement, which Royal considered so insignificant that it did not charge an increased premium when the endorsement was added. While the MEL endorsement extends coverage for bodily injury to a master or member of the crew of a vessel, the description of the work covered under the MEL is confined to the typical shore-side activities of "[p]ainting and/or scrubbing of decks of tugs or barges, and loading and unloading as applicable in Washington and Alaska." Moreover, Royal itself argued that it never imagined that the MEL endorsement would cover Jones Act crewmen or insure against maritime risks because Kelly-Ryan consistently represented that its marine-related risks were insured through others. Furthermore, Kelly-Ryan obtained separate P&I coverage through the P&I Underwriters to cover personal injury to Kelly Ryan's crew members, vessels, and maritime operations.

[6] When considered as a whole, the "*sea* components [of the Big Shield policy, even with the MEL endorsement,] are insubstantial," *Norfolk S. Ry. Co.*, 543 U.S. at 27, and lack the "genuinely salty flavor" of a marine insurance contract, *id.* at 22 (quoting *Kossick*, 365 U.S. at 742). Moreover, the linkage

between the employers' liability policy and maritime commerce is "too tenuous to justify classifying the insurance . . . as a maritime obligation or interest sufficient to bring the policies . . . within the pale of admiralty jurisdiction." *Simon*, 882 F.2d at 1443. Neither the primary interests insured nor the principal risks insured against in the Big Shield policy, even considering as well the MEL endorsement, are fundamentally maritime in nature; thus, Kelly-Ryan's claim for indemnity under the Big Shield policy for the cost of the Okada settlement is not a maritime insurance contract claim over which we may exercise admiralty jurisdiction.

### 2. Supplemental Jurisdiction

Although admiralty jurisdiction does not extend to the Big Shield policy, the district court had supplemental jurisdiction over Kelly-Ryan's claim against Royal under 28 U.S.C. § 1367. As required under section 1367, the district court had original jurisdiction in admiralty over the suit because the initial suit sought a declaratory judgment, in part, on policies of marine insurance issued by the P&I Underwriters. The district court had supplemental jurisdiction over Kelly-Ryan and the P&I Underwriters' claim against Royal because that claim was "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

### B.  Application of State Law

**[7]** Because admiralty jurisdiction does not extend to Kelly-Ryan's claim for indemnity against Royal, federal admiralty law does not apply. *See Norfolk S. Ry. Co.*, 543 U.S. at 23 ("[F]or federal common law to apply in these circumstances, this suit *must* also be sustainable under the admiralty jurisdiction. Because the grant of admiralty jurisdiction and the power to make admiralty law are mutually dependent, the two are often intertwined in our cases." (citation omitted)). There-

fore, we do not apply the federal maritime doctrine of *uberri-mae fidei*.

**[8]** Applying Washington State law instead, we conclude that the Big Shield policy and the MEL endorsement are not void for misrepresentation or for the failure to disclose material facts because Kelly-Ryan did not have the requisite intent to deceive. Under Washington law, "no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or avoid the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive." Wash. Rev. Code § 48.18.090(1); *see also Cutter & Buck, Inc. v. Genesis Ins. Co.*, 306 F. Supp. 2d 988, 1004 (W.D. Wash. 2004), *aff'd*, 144 Fed. Appx. 600 (9th Cir. 2005). In addition, Royal's bare allegation that Kelly-Ryan made false or misleading statements during the course of negotiations regarding coverage for Jones Act claims under the MEL endorsement is not sufficient for us to conclude that Kelly-Ryan knowingly made false material statements giving rise to the presumption of "intent to deceive" under Washington law. *See Wilburn v. Pioneer Mut. Life Ins. Co.*, 8 Wash. App. 616, 620, 508 P.2d 632 (1973).

### C.   *Liability under the MEL Endorsement*

**[9]** Applying Washington State law to the question whether Royal is obligated to provide indemnity for the Okada settlement, we hold that Royal is not so obligated because Okada's injuries did not result from an accident covered by the MEL endorsement.

**[10]** The MEL endorsement extended insurance coverage by Royal for bodily injury suffered by a "master or member of the crew" of a Kelly-Ryan vessel when such person was performing work "necessary or incidental" to "Painting and/or scraping of decks of tugs or barges, and loading and unloading as applicable in Washington and Alaska." The injured per-

son in the present case, Okada, was not injured during the performance of any of these tasks.

Kelly-Ryan contends, and the district court concluded, that Okada was injured while "unloading" the prefabricated house from the barge to the house mover, which included delivery of the house to the construction site. We disagree.

Although the district court correctly determined that the term "loading and unloading" is ambiguous under Washington law, the court erred in failing to consider the definition of "loading and unloading" contained in the CGL policy as extrinsic evidence of the parties' intent. The CGL policy contains a definition of "loading or unloading," and that policy was relevant extrinsic evidence because the Big Shield policy, to which the MEL endorsement applied, was an umbrella policy of insurance in excess of both the CGL and employers' liability policy. The nature of this umbrella policy "as an additional layer of excess coverage suggests the parties intended to provide the same coverage as the underlying [ ] policy." *Pub. Util. Dist. No. 1 v. Int'l Ins. Co.*, 124 Wn.2d 789, 799, 881 P.2d 1020 (1994).

To determine the intent of the parties in the face of ambiguity, we look first to "evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." *Berg v. Hudesman*, 115 Wn.2d 657, 668, 801 P.2d 222 (1990) (quoting Restatement (Second) of Contracts § 212 cmt. b (1981)). *Accord Pub. Util. Dist. No. 1*, 124 Wn.2d at 799 (applying rule of *Berg* to interpret a marine insurance contract).

**[11]** We may examine the underlying CGL policy as evidence of the parties' intent under Washington law because it is an "[a]greement[ ] . . . contemporaneous with the adoption of a writing [that is] admissible in evidence to establish . . . the meaning of the writing, whether or not integrated." *Berg*,

115 Wn.2d at 668 (first and fifth alterations in original) (quoting Restatement (Second) of Contracts § 214(c)). The CGL policy's definition of "loading or unloading" clearly does not encompass the delivery of a house on a house mover to a construction site:

> 11. "Loading or unloading" means the handling of property
>
> . . .
>
> > c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;
> > but "loading or unloading" does not include the movement of property by means of mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

In addition, under the Big Shield policy, the house mover would be a piece of "mobile equipment" because it is a "[v]ehicle[ ] that travel[s] on crawler treads" as defined by the Big Shield policy. Considering both of these definitions, we conclude that the house mover is a piece of "mobile equipment" under the Big Shield policy and under the CGL policy it is a "mechanical device . . . that is not attached to the . . . watercraft." This strongly supports Royal's contention that the parties never intended "unloading" to encompass the movement of a house on a house mover to a construction site.

Furthermore, if any ambiguity remains after resort to the foregoing extrinsic evidence, the district court should have looked to evidence of trade usage to assess the reasonableness of the parties' interpretations. *See Pub. Util. Dist. No. 1*, 124 Wn.2d at 799 ("To determine the parties' intent, the court first will view the contract as a whole, examining its subject matter . . . and the reasonableness of [the parties'] respective inter-

pretations."); *Berg*, 115 Wn.2d at 668 (court may look to usages of trade). Under Washington law, "the general rule is that such language [technical or terms of art] is to be given its technical meaning when used in a transaction within its technical field." *Berg*, 115 Wn.2d at 666 (citing *Keeton v. Dep't of Soc. & Health Servs.*, 34 Wash. App. 353, 361, 661 P.2d 982 (1983); Restatement (Second) of Contracts § 202(3)(b) (1981)).

Expert testimony was presented in this case on the definition of "unloading" in the maritime context. Experts from both of the P&I Underwriters answered in the affirmative when asked if "in the industry generally, unloading cargo is deemed to mean offloading it from the vessel onto another dock, wharf or another vessel." In addition, Alaska National's underwriter testified that he too understood the transportation of the houses on the house movers to be outside the scope of "unloading" coverage under the MEL.

The district court, however, erroneously borrowed a definition of "unloading" from the automobile context, defining "unloading" under a "complete operations theory" as "the entire process involved in the movement of the article, thereby omitting any distinction between 'loading' and preparatory activities or 'unloading' and 'delivery.' " *Transamerica Ins. Group*, 92 Wn.2d at 25. The district court should not have adopted this definition of "unloading" wholesale from the automobile insurance context. Coverage under an automobile insurance policy generally turns on whether an accident arises out of "operation, maintenance and use" of a vehicle, which clearly shapes the definition of "loading and unloading." *See* 6B-184 *Appleman on Insurance Law & Practice* § 4322 (1st ed. 2006) ("[E]ach case must be treated according to the facts involved, taking into consideration the connection between the unloading or loading and the operation, maintenance and use of the vehicle, construing such coverage as an extension of, rather than a limitation upon, the operation, maintenance, and use clause.").

Moreover, the Washington State cases on which the district court relied[2] were decided prior to the Washington Supreme Court's decision in *Berg*, 115 Wn.2d at 668-70, in which the Court adopted the Second Restatement's context rule that ambiguities are to be construed in light of extrinsic evidence of the parties' intent. The ambiguous use of "unloading" in this case is resolved by the applicable extrinsic evidence as to the parties' intent. The term "unloading" does not include delivery of the prefabricated house to its construction site, a mile and a half inland from the wharf where the house was unloaded from the barge onto the house mover. Therefore, Okada was not injured during the "unloading" of the house.[3]

Kelly-Ryan also argues that Okada's work atop the house mover fell within the MEL endorsement's requirement that an accident occur during work which is "necessary or incidental" to "unloading." We disagree. Moving a house on a house mover over a mile inland is clearly not "necessary" to complete the "unloading" of the house from the barge. Kelly-Ryan's contention that delivery to a remote construction site is "incidental" to "unloading" from the barge is also unpersuasive because it leads to an unreasonable and strained construction of the word "incidental." *Transcontinental Ins. Co. v. Wash. Pub. Utils. Dists. Util. Sys.*, 111 Wn.2d 452, 457,

---

[2]*McDonald Indus., Inc.*, 95 Wn.2d at 914; *Transamerica Ins. Group*, 92 Wn.2d at 25; *Fiscus Motor Freight, Inc. v. Universal Sec. Ins. Co.*, 53 Wash. App. 777, 770 P.2d 679 (1989).

[3]The Washington Supreme Court has acknowledged that there exists a "a split of authority as to whether 'loading and unloading' extends coverage to include that time when the goods are 'at rest' or until there is a completed operation.' " *McDonald Indus., Inc. v. Rollins Leasing Corp.*, 95 Wn. 2d 909, 914, 631 P.2d 947 (1981); *see also Transamerica Ins. Group*, 92 Wn.2d at 25. The district court erred in adopting a definition most favorable to the insured because we do not apply the contra-insurer rule of interpretation where the insured or its broker has drafted the ambiguous language, which was what occurred in this case. *See Travelers Indem. Co. v. United States*, 543 F.2d 71, 74 (9th Cir. 1976) (stating that the rule of strict construction "has no applicability when the language is supplied by the insured, his agent or his broker").

760 P.2d 337 (1988) ("[A] policy should be given a practical and reasonable interpretation rather than a strained or forced construction that leads to an absurd conclusion, or that renders the policy nonsensical or ineffective.").

Kelly-Ryan's suggested definition of "incidental" is also inconsistent with the ordinary meaning of that term. *Black's Law Dictionary* defines "incidental" as "[d]epending upon or appertaining to something else as primary, something necessary, appertaining to, or depending upon another, which is termed the principal; something incidental to the main purpose." *Black's Law Dictionary* 686 (5th ed. 1979). *Webster's* similarly defines "incidental" as "[s]ubordinate, nonessential, or attendant in position or significance: as a: occurring merely by chance or without intention or calculation . . . b: being likely to ensue as a chance or minor consequence." *Webster's Third New International Dictionary* 1142 (1986). The activities subsequent to the transfer of the prefabricated house to the house mover — driving the house mover over a mile inland, dispatching a crew to accompany the mover and secure the route, coordinating the depowering of multiple power lines, and unloading the house from the house mover to the construction site — cannot possibly be considered "chance or minor consequence[s]" dependent upon or incidental to the "main purpose" of the transfer of the house from the barge to the house mover.

## IV.  CONCLUSION

Because the Big Shield policy, even with the MEL endorsement, is not a marine insurance policy over which admiralty jurisdiction extends, we reverse the district court's summary judgment in favor of Royal on *uberrimae fidei*. Federal law does not apply to Kelly-Ryan's claim for indemnity against Royal. Applying Washington State law, we decline to void the MEL endorsement because Royal has failed to demonstrate that Kelly-Ryan acted with the requisite "intent to deceive" in negotiating and applying for that endorsement.

However, Royal is not obligated to provide indemnity for Okada's injuries because the accident that caused those injuries was not an event covered by the MEL endorsement or by the Big Shield policy.

The parties shall each bear their own costs for this appeal. The district court's summary judgment in favor of Royal is

**AFFIRMED.**